# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

JAMES J. BARBEE                    CIVIL ACTION NO. 06-1605

VS.                                SECTION P

WARDEN BURL CAIN                   JUDGE MELANÇON

                                   MAGISTRATE JUDGE HILL

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2254 on September 14, 2006 by *pro se* petitioner James J. Barbee.[1] Petitioner is an inmate in the custody of Louisiana's Department of Public Safety and Corrections. He is incarcerated at the Louisiana State Penitentiary in Angola, Louisiana where is serving a ninety-nine year sentence imposed following petitioner's December 17, 2002 conviction for armed robbery entered in the Sixteenth Judicial District Court for St. Mary Parish.

## PROCEDURAL HISTORY

Petitioner was charged with three counts of armed robbery, to wit, the March 12, 2002 armed robbery of Melissa Marcel at Ganaway's #3, the March 17, 2002 armed robbery of Patsy Swords at Ride's Shell/Friend's #1 and the March 19, 2002 armed robbery of Carlette Aucoin at Lakeside Supermarket. [tr. pg. 30, 31 and 419].

---

[1]The standardized petition is dated September 10, 2006, the memorandum in support is dated September 14, 2006 and the envelope mailed to this court containing both of petitioner's pleadings is postmarked September 15, 2006.  Accordingly, giving petitioner the benefit of the "mailbox" rule, the earliest date petitioner could have mailed his pleadings to this court is September 14, 2006.

Prior to trial, the defense filed several motions[2], including a Motion for Discovery and for Preliminary Hearing. [tr. pg. 50-52]. The Motion was heard on November 22, 2002. At the hearing, the State confirmed that it had provided defense counsel, Gary F. LeGros, Jr., with all documents contained in the State's file, including some received that morning. Mr. LeGros confirmed that he had received that discovery. The State also informed defense counsel that it had videos and still photographs of the Ganaway and Ride Shell robberies, and audio from the officer's patrol unit at the time of petitioner's arrest after the Lakeside Supermarket robbery, and that these were available for review. [tr. pg. 733-734].

Officer Crochet was the sole witness testifying for the State at the Preliminary Hearing. With respect to the March 12, 2002 robbery, Crochet testified that police received a complaint about a robbery committed by a black male wearing "a mask or some type of scarf over his face" and clear plastic gloves, carrying a large knife. [tr. pg. 734-735].

The police received the report of a second robbery on March 17, 2002, committed by a black male wearing something covering his face and some type of plastic gloves on his hands, carrying a large kitchen knife. [tr. pg. 735-736].

With respect to the March 19, 2002 armed robbery, Officer Crochet testified that a friend of Corporal Teddy Liner, Rhonda Patterson, had phoned about a suspicious black

---

[2]These defense Motions include a Motion for Speedy Trial which the court granted ordering the State to follow the dictates of La.C.Cr.P. art. 701, and a Motion for Release without bail obligations which was denied at a hearing on June 17, 2002, wherein petitioner was represented by Gregory P. Aucoin. The court thereafter set bond on each of petitioner's other armed robbery counts. [tr. pg. 29, 43 and 12].

2

male loitering outside of the Lakeside Supermarket wearing a white shirt and navy shorts with a light colored wrapping around his face with only his eyes showing.  Officer Vidos and Sergeant Maze responded.  After spotting a black male fitting the description, Officer Vidos attempted to speak with him.  However, the suspect began to run.  Officer Maze apprehended him in a field.  The suspect (petitioner) had a number of loose twenty dollar bills on the ground beneath him, along with a red money bag and clear plastic gloves, the same type used in the two prior armed robberies.

At about this time, the police received a call from the Lakeside Supermarket reporting an armed robbery, perpetrated by a black male wearing something over his face holding a butcher knife.  An audio recorded by police at the scene demonstrated that after being advised of his constitutional rights, the suspect was questioned about the whereabouts of the knife; petitioner responded that he had dropped it somewhere along the way.  The knife, as well a portion of the t-shirt worn around the suspect's face, was located at the rear corner of the store, along the path that the petitioner had run.  The owner of Lakeside Supermarket identified the red money bag and receipts that were found under the suspect (petitioner)  as his property. [tr. pg. 736-793; 741-743].

Defense counsel cross examined Crochet attacking the State's identification of petitioner.   Crochet verified that there was never any identification of petitioner as the robber in the first two robberies.  Rather, the State's proof on those robberies was circumstantial, that is, that the same this method was used, as well as the gloves, light

3

colored shirt and dark colored pants.  Crochet admitted that although he did not think that the arresting officers lost sight of the suspect during the chase, if they had, it would have only been for a second or two.  Crochet further admitted that the money, money bag and gloves were found, not on, but underneath, petitioner.  [tr. pg. 739-741].

Based on the State's presentation, the Court found probable cause to hold petitioner. [tr. pg. 744].  Defense counsel then advised the court that petitioner had rejected the State's plea offer whereby petitioner would plead guilty to count three (the Lakeside Supermarket robbery), the remaining two armed robbery charges would be dismissed, a sentencing cap of fifty years would be applicable and the State would not file a multiple offender bill against petitioner.  Petitioner and the State confirmed that this was in fact the case. Defense counsel also verified petitioner's understanding that, in the event of conviction, considering his past record, he could receive a mandatory life sentence; petitioner said that he understood. [tr. pg. 744-745].

Following the November 22, 2002, hearing petitioner stated that if it were possible, he would like to "change lawyers." Mr. LeGros, the court appointed counsel for the petitioner,  then told petitioner "tell the judge if you're not satisfied. I want this matter to come up right now and not at the time of this trial."

The trial judge then advised petitioner that he had a right to be represented by an attorney at all times, that if he could afford a lawyer he was free to hire whoever he wanted to represent him, and that if he could not afford to hire counsel of his choosing, the court

4

would appoint a lawyer for him, but that he did not have a choice as to whom the court

would appoint. Petitioner acknowledged his understanding.  Petitioner then outlined his

dissatisfaction with Mr. LeGros as follows:

> But the thing is I had stated this to Mr. LeGros every time he had came to
> speak to me.  It was never a discussion about my case, it was always a
> discussion about a plea.  And any time I had made any reference to, well, can
> I tell my side of the story he would get upset.  He said if you was looking for
> a friend you should have hired one.  I said, Mr, LeGros, I said, all I desire is
> some form of defense.  I said – he said, well, irregardless of what you think,
> innocent or not, you're going to be found guilty when you go to trial.  I said,
> well, how do you expect me to find any comfort in knowing that you're going
> to defend me to the fullest.  Well, to him it didn't matter.

Mr. LeGros then responded to petitioner's comments as follows:

> I listened to Mr. Barbee's whole story on two occasions and I'm telling this in
> front of the Court I disagree with his characterization, Mr. Barbee, and I put
> my reputation on this Court.  You can't make chicken salad out of chicken
> feathers and sometimes you've just got a case that's going to be difficult and
> impossible to win and that's what I told Mr. Barbee.

The trial judge then stated:

> ... the Court is very familiar with Mr. LeGros and Mr. LeGros' legal abilities.
> He's an experienced trial lawyer.  He's an experienced defense lawyer. He's
> been doing this for probably fifteen years ...eighteen years ... He is one of the
> most experienced defense lawyers that we have in this parish.  If you are not
> satisfied with him, then I would suggest that you find a way to hire your own
> lawyer.

Petitioner responded:

> All right.  I'm not saying that he's not experienced.  I never had any doubt
> about that, but the thing is, if he's going to present a defense to the fullest at
> least he says that we discussed, he don't even know where I'm from, he
> don't know what I said I was wearing that night.  How does he say he

5

discussed my case?  I mean, it's never been any question about my side of the
story.  So how am I supposed to feel comfortable about him even defending
me if he ain't even took time out to even – you see, I didn't even know I was
coming to court today, you know, I never know anything until I get here and
this is – everything is so rushed you can't present your side at all.

The court responded:

All right sir.  Today was a preliminary hearing, that's when the State puts on
some evidence of what it alleges you did ... and the Court determines from
that whether or not there is probable cause to hold you on the charges, which
I determined there was. I'm certain that Mr. LeGros is going to meet with
you again to discuss any defenses you have and discuss a strategy for trial of
the case and you are on record, Mr. Barbee, expressing your feelings and
opinion about this, but the Court is going to maintain Mr. LeGros as your
attorney.

[tr. pgs. 837-840].

The court advised petitioner of his December 16, 2002 trial date and assured

petitioner that Mr. LeGros would meet with him again. [tr. pg. 840].

On December 16, 2002, petitioner's trial commenced. After jury selection and the

State's opening statement, petitioner informed his counsel that he wanted to represent

himself.  Mr. LeGros advised that he thought that was a "horrible idea", but nevertheless

informed the court of his client's wishes.  The court immediately held a hearing, outside the

presence of the jury,  on petitioner's request.  Initially, the court verified the extent of

petitioner's education, which included a degree from junior college in liberal arts followed

by two semesters in college studying pre-law and business administration. The court also

verified petitioner's work experience which included work doing "problem solving" for the

Department of Labor and IRS as an employee of a company contracted by the United

6

States. [tr. pg. 425-427].

After petitioner informed the court that he wanted to represent himself explaining that  he "would feel more comfortable if [he] represented [him]self", the following colloquy transpired between the court and petitioner:

> Court: Okay.  Well, let me tell you that for a defendant to represent himself is almost always an unwise decision.
>
> Petitioner: Sure.
>
> Court: And that decision if I accept it and allow you to do that could be very detrimental to you.
>
> Petitioner: Sure.  I'm aware of that.
>
> Court: Are you aware of the charges against you?
>
> Petitioner: Yes, sir.
>
> Court: What is armed robbery?
>
> Petitioner: I can't explain it in the technical term, but I know it has to do with use of a weapon against a person or company taking money or – in an aggravated manner.
>
> Court: Okay.  Do you understand what the possible penalty is for –
>
> Petitioner: Yes, sir.
>
> Court: Armed robbery?
>
> Petitioner: Yes, sir.
> Court: Can you tell me what you understand to be the possible penalty?
>
> Petitioner: Yes.   Each charge carries from ten to ninety-nine years.
>
> Court: Okay.  At hard labor.

7

Petitioner: Yes, sir.

Court: Okay.  Do you understand that if I allow you to represent yourself that you will be at a tremendous disadvantage? The Assistant District Attorney is well qualified, and is well schooled, and has been trying this kind of case for a long period of time.

Petitioner: Yes, sir.

Court: And you will be trying the case by yourself without any of that experience. Do you understand that?

Petitioner: Yes, sir, and you know, I respect that as well.

Court: Okay.  And do you understand that if I allow you to represent yourself that I cannot give you any special treatment as – in any matter that involves court procedures, matters of evidence, matters of procedure, any matter of law.  I cannot give you any preference.  I can't give you any special treatment.  Do you understand that?

Petitioner: I respect that as well.

Court: And of course, Mr. McClelland, as I say, has been doing this for quite awhile, and he knows all those procedures, and he knows all those laws, and maybe you don't.

Petitioner: Yes, sir. I'm fully aware of that.

Court: Okay.  And you're willing to take that risk?

Petitioner: Yes, sir, I am.

Court: Do you understand that if I allow you to represent yourself that, in fact, you must follow all technical rules of law, and evidence, and criminal procedure?
Petitioner: Yes, sir.

Court: And that if you fail to do so that the District Attorney may make an objection and I find that his objection is well founded that I will sustain the objection.

Petitioner: Sure.

Court: You understand what it means to sustain an objection?

Petitioner: Yes, sir.

Court: What does it mean?

Petitioner: If you substain [sic] an objection that means like whatever I ask I pretty much have to agree – change my questioning or – I at least know that whatever you sustain I just can't go further.

Court: If he objects and if I sustain that means you won't be allowed to go on further on that point basically.

Petitioner: Right.

Court: Do you understand that?

Petitioner: Yes, sir.

Court: Okay.  You understand that Mr. McClelland being the experienced attorney that he is isn't going to go easy on you?

Petitioner: Sure.

Court: And he isn't going to give you any special treatment just because you want to represent yourself.

Petitioner: Sure.

Court: You understand that?

Petitioner: Yes, sir.

Court: Okay. Now we are in the middle of the trial.  We've already selected the jury and the jury is ready to go.  We've had the opening statement of the State.  We are in the noon recess.  We'll pick up again at one-fifteen at which point under ordinary circumstances the defense may make an opening statement.

Petitioner: Yes. sir.

9

Court: And do you understand if you want to represent yourself then you'll have the decision to make whether or not you want to make an opening statement?

Petitioner: yes, sir.

Court: And if you decide that you want to make an opening statement that you'll have to make that opening statement to the jury?

Petitioner: Yes, sir.

Court: And as far as any issues of law that you would have no special privileges, library privileges, other than any other person practicing law.  Do you understand that?

Petitioner: Yes, sir.  Yes, sir.

Court: And you will have no extra time because we're in the middle of the case right now.

Petitioner: Yes, sir.

Court: We've begun the case.

Petitioner: Yes, sir.

Court: So you would not have any extra time to prepare or do anything else.  Do you understand that?

Petitioner: Yes, sir.

Court: And you won't have any time to investigate should you want to do any kind of investigation.

Petitioner: Sure.
Court: You understand that?

Petitioner: Yes, sir.

Court: Okay.  There are rules of conduct in the courtroom and attorneys who are licensed to practice law in Louisiana must abide by certain ethical rules and certain rules that have been approved by the Supreme Court in the conduct of their affairs

and you will be held to the same standards as a practicing attorney such as Mr. McClelland.  Do you understand that?

Petitioner: Yes, sir.

Court: And that means that you can't become disruptive of the proceedings.

Petitioner: Yes, sir.

Court: You may make objections at the proper time and you may state your objections in the way that I direct that they may be stated here at the bench and put it on the record, but you will not be allowed to disrupt the proceedings in court.  Do you understand that?

Petitioner: Yes, sir.

Court: Okay.  If you represent yourself knowing full-well that Mr. LeGros has been representing you all along and that Mr. LeGros has been a member of this bar for approximately seventeen years if I'm – is that correct?

Mr. LeGros: Twenty, but who's counting.

Court: Okay.  Twenty, but who's counting; and has been representing defendants for pretty much all of that time.  That if you represent yourself knowing that he's available for you, then you won't be able to claim a lack of representation, or you won't be able to claim inadequate representation of yourself.

Petitioner: Sure.

Court: You understand that?

Petitioner: Yes, sir.

Court: Okay.  Is this a snap decision that you've come to this morning or is this something that you've considered all along?
Petitioner: I've considered it all along.

Court: Okay.  For how long have you considered it?

Petitioner: Since my pre-trial.  I actually contemplated it before then, but during the November 22nd pre-trial.

Court: Okay.  Have you discussed this decision with anyone other than Mr. LeGros?

Petitioner: No, sir.

Court: You have no family members that you discussed it with or anything like that?

Petitioner: Oh, I briefly briefed my father earlier.  He went to recess as well.  Yes, I had told him.

Court: All right.  You discussed it with him then?

Petitioner: Yes, sir.

Court: Okay.  You understand the charge.  You told me what you understand armed robbery to be and that's taking something from somebody or in their immediate possession while armed with a dangerous weapon by use of either force or intimidation.

Petitioner: Right, yes, sir.

Court: And you understand that?

Petitioner: Yes, sir.

Court: Okay.  And you've already explained to me the possible penalties.

Petitioner: Yes, sir.

Court: And it's still after all this discussion and my advising you that it's not a good idea for you to represent yourself and my telling you that it is a bad idea for you to represent yourself do you still want to represent yourself?

Petitioner: Yes. I respect that and I still do.
Court: Okay.  All right.  If I allow you to represent yourself it will be with the understanding that Mr. LeGros is going to be available for you to discuss things with him as the trial progresses, but Mr. LeGros since you're gonna represent yourself won't be your attorney.

Petitioner: Yes.

12

Court: He will be available for you to consult with on an informal basis, but he won't be allowed to make objections and so forth because that's what you would do.  You understand that?

Petitioner: Yes, sir, and I was hoping that he would.

Court: And that is what you want?

Petitioner: Yes, sir.

Court: Okay.  So that if there are any questions that you have about the rules of courtroom procedure, or evidence, or making your objections, or any matter during the trial then Mr. LeGros will be there as standby counsel for you, but he won't have any responsibility for trying your case.

Petitioner: Yes, sir.

Court: Do you understand that?

Petitioner: Yes, sir.

Court: And that is what you want?

Petitioner: Yes, sir.

Court: Okay.  Well, the Court finds Mr. Barbee, that you are a person of obvious intelligence, that having completed the schooling that you've completed, and having done the work that you have done in your lifetime that – have you had any experience in court?

Petitioner: No sir, just – no.  Just sit-ins you know, admiring it and you know, things of that nature.  No actual participation.

Court.  All right.  Finding that you are a person of suitable age, and discretion, and intelligence then reluctantly I will allow you to represent yourself and I will appoint Mr. LeGros as standby counsel for you to consult with him as you may deem necessary.

[tr. pg. 427-433].

After this extensive questioning by the court, petitioner's request was granted and petitioner was permitted to represent himself.  However, petitioner's former court appointed counsel, Gary F. LeGros, Jr., was appointed as standby counsel. [*Id.*].

Petitioner then advised the court that he wanted to file a Motion to Suppress the videotapes mentioned at the preliminary hearing, a copy of which Mr. LeGros had in his file, and which was provided to the court.  The court ordered the State to make the tapes available to petitioner for review during the lunch break and that the Motion to Suppress would be heard after the break.  Following the lunch break, petitioner's Motion to Suppress was denied because the court found that the issues raised in the Motion did not go to the admissibility of the videos, but rather were matters for argument to the jury. [tr. pg. 437].

Petitioner also inquired whether Mr. LeGros had issued subpoenas for the clothes petitioner was wearing when he was booked on March 19, 2002, as well as his mug shot that date, as he had requested LeGros do during LeGros' visit with petitioner on December 13, 2002.  LeGros responded that he had issued the subpoena and that he had been assured by one of the police officers that the items would be available for the trial. Mr. McClelland, the prosecutor, also verified that he knew of the subpoena and that the items would be produced by Detective Gilbert Blanchard that afternoon. [tr. pg. 433-435].  That subpoena, requested on December 13, 2002, is contained in the record. [tr. pg. 105].

On December 17, 2002, petitioner was found not guilty on counts 1 and 2, and guilty as charged on count 3, the armed robbery of Carlette Aucoin at the Lakeside Supermarket.

14

On January 28, 2003, petitioner was sentenced to serve 50 years imprisonment. [tr. pg. 592].  During sentencing, petitioner continued to represent himself with Mr. LeGros as standby counsel.  After making a statement to the court, petitioner responded to questions of the prosecutor regarding his prior crimes, and admitted several such crimes.  Before petitioner continued incriminating himself, Mr. LeGros suggested that Mr. Barbee ask to consult him.  Petitioner did so and then, in accordance with Mr. LeGros' advice, asserted his Fifth Amendment privilege with respect to further questioning about past offenses, considering the upcoming habitual offender charge which would be filed by the State. [tr. pg. 576-579].  A copy of petitioner's rap sheet was entered into evidence and a copy was provided by defense counsel to petitioner. [tr. pg. 590].  Petitioner's oral motion for an appeal was granted and the court stated that the Appellate Project would be appointed to represent petitioner in his appeal process. [tr. pg. 576, 593].

The State filed  a Multiple Offender Bill against petitioner on February 7, 2003. On February 14, 2003, petitioner was arraigned as an Habitual Offender. [tr. pg. 178-179, 23]. The court appointed Mr. LeGros to represent petitioner in connection with the Habitual Offender proceeding. [tr. pg. 23].

On March 14, 2003, petitioner filed a Motion to Remove Attorney.  [tr. pg. 196]. Thereafter, on April 1, 2003, petitioner filed a written Motion for Appeal. [tr. pg. 206]. Both Motions were taken up at a hearing on April 4, 2003.  At the hearing, petitioner asked that another indigent defender be appointed to represent him at the habitual offender

15

hearing.  The judge advised that the only thing he could do was to appoint the Indigent Defender Board, and accordingly, the court appointed the Indigent Defender Board to represent petitioner for purposes of the habitual offender hearing. [tr. pg. 598]. With respect to petitioner's appeal, the court again appointed the Appellate Project to represent petitioner on appeal. The multiple offender hearing was reset for May 9, 2003.  [tr. pg. 598-599, 210].

On April 15, 2003, petitioner filed an application for post-conviction relief seeking an out-of-time appeal. [tr. pg. 216-221].  The court again appointed the Louisiana Appellate Project to represent petitioner on appeal.  Perhaps recognizing that petitioner had previously orally requested an appeal during his original January 28, 2003 sentencing [tr. pg. 576, 593], by Order dated April 17, 2003, the court "scratched out" the portion of the Order granting an out-of-time appeal[3], instead merely re-appointing the Louisiana Appellate Project. [tr. pg. 222].

On May 9, 2003, a hearing was conducted with respect to petitioner's multiple offender adjudication.  At that time, the State incorrectly explained that the court had previously relieved the Indigent Defender Board and appointed the Appellate Project to represent petitioner at the multiple offender proceeding.  The court therefore ordered that the Indigent Defender Board be "re-appointed" to represent petitioner in multiple offender proceedings, stating that he would "request" the either Greg Aucoin or Craig Colwart be

_____

[3]It appears that the Order signed by the court was submitted by petitioner with his motion.

16

appointed to petitioner's case. [tr. pg. 603].  The hearing was thereafter reset for July 18, 2003.

On July 18, 2003, the multiple offender hearing was conducted. Mr. LeGros appeared for petitioner.  Petitioner asked the court why Mr. LeGros was there to represent him and the court explained that for purposes the hearing he had appointed the Indigent Defender Board.  Mr. Barbee stated that he was told that his attorney would speak to him before the hearing and that had not occurred.  The court then recessed.

After the recess, the prosecutor and Mr. LeGros advised the court that Mr. LeGros had previously received all of the documents on which the State would rely and that these documents had been provided to petitioner during the arraignment on the multiple offender bill. Mr. LeGros also advised that he had explained the documents, the State's burden of proof and petitioner's rights to petitioner at that time, and that he further explained these things to petitioner prior to the hearing that morning.  Petitioner acknowledged that was correct.  [tr. pg. 608-610].  During the hearing, Mr. LeGros cross-examined the State's witness and argued on petitioner's behalf. [tr. pg. 614-620].  At the conclusion of the hearing, petitioner was adjudicated an habitual offender for which he was sentenced to serve ninety-nine years imprisonment.   However, the trial judge failed to vacate the original fifty year sentence when imposing the enhanced multiple offender sentence. [tr. pg. 620]. Mr. LeGros moved for reconsideration of petitioner's sentence, and after this request was denied, then moved for an appeal. [tr. pg. 621, 27].

17

On May 8, 2003, Mr. LeGros submitted an Order requesting that an out-of-time appeal be granted and a return date be set. The court signed the order on May 9, 2003.[4]

On October 20, 2003, appellate counsel filed a brief on behalf of petitioner raising two assignments of error: (1) that the trial court abused its discretion in finding petitioner an habitual offender, and (2) that the trial court erred in failing to vacate petitioner's original sentence.  On May 14, 2004, the Louisiana First Circuit Court of Appeals affirmed petitioner's conviction and the original fifty year sentence, but vacated the Habitual Offender adjudication and enhanced sentence.  The case was therefore remanded to the lower court for further proceedings.  *State of Louisiana v. James Jeffrey Barbee*, 2003-2057, 874 So.2d 431 (La. App. 1 Cir. 5/14/2004) (unpublished).

On June 17, 2004,  a second Habitual Offender hearing was held.  Mr. LeGros was again appointed to represent petitioner.  At the conclusion of the hearing, petitioner was again adjudicated an Habitual Offender.  Petitioner's original fifty year sentence was vacated and petitioner was again sentenced to serve an enhanced ninety-nine year sentence. [tr. pg. 761].  Petitioner did not appeal his multiple offender adjudication or the enhanced sentence imposed therein.

On January 28, 2005, petitioner filed an Application for Post-Conviction Relief in the Sixteenth Judicial District Court.  In his application, petitioner raised the following

---

[4]The Order refers to a May 5, 2003 Order of the court which allegedly granted post-conviction relief allowing petitioner an out-of-time appeal.  However, the record contains no such Order.  Although it is unclear whether this Order was submitted as a follow-up to Mr. LeGros' oral motion in court, that appears to be the case.

18

claims: (1) ineffective assistance of counsel, (2) that petitioner was denied his right to counsel, a fair trial and due process, (3) that the trial court abused its discretion in allowing petitioner to represent himself at trial, (4) that petitioner was denied his right of access to court, and (5) that the trial court abused its discretion in appointing Mr. LeGros to represent petitioner in the multiple offender proceedings after petitioner had previously dismissed him.  On February 3, 2005, the trial court summarily denied petitioner's application for post-conviction relief.

On February 22, 2005, petitioner mailed an application for supervisory writs to the Louisiana First Circuit Court of Appeal.  The application was received by that court on February 28, 2005 and filed under that court's docket number 2005-KW-0397. On April 18, 2005, the First Circuit denied petitioner's request for writs because petitioner had failed to submit all documentation required by Uniform Rules - Courts of Appeal, Rules 2-18.7 and 4.9. Petitioner was advised that neither supplementation of the writ application nor a request for rehearing would be considered.  Petitioner was further advised that in the event petitioner elected to file a new writ application, he should file the application with all required documentation on or before June 20, 2005.  *State v. Barbee*, No. 2005-KW-0397 (La.App 1st Cir. 4/18/05) (unpublished).

On June 8, 2005, petitioner mailed a new application for supervisory writs to the Louisiana First Circuit Court of Appeal.  That application was received by the court on June 20, 2005 and filed under that court's docket number 2005-KW-1286.  On August 22, 2005,

the First Circuit summarily denied petitioner's request for writs without comment. *State v. Barbee*, No. 2005-KW-1286 (La. App 1st Cir. 8/22/05) (unpublished).

Petitioner's request for discretionary review in the Louisiana Supreme Court was denied on August 18, 2006.  *State ex rel. James J. Barbee v. State of Louisiana*, 2006-0243, 935 So.2d 136 (La. 8/18/2006).

Petitioner dated his federal *habeas corpus* petition September 10, 2006, and dated his memorandum in support September 14, 2006; the envelope containing both pleadings is postmarked September 15, 2006. The petition was received and filed by the Clerk of this court on September 18, 2006.  Petitioner raises the same claims here as were raised in the State post-conviction proceedings.

The State has filed an Answer and submitted the state court record for this court's review.  [doc. 15].  Petitioner has filed a Reply. [doc. 16].  This Report and Recommendation follows.

After a full review of the record, the undersigned finds that the grounds asserted for relief are without merit. Accordingly, for the following reasons,  it is recommended that the petition be **DENIED AND DISMISSED WITH PREJUDICE.**

_____

## LAW AND ANALYSIS

### Preliminary Review

***Timeliness***

The State argues that the instant petition is untimely pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA sets out procedures that a prisoner "in custody pursuant to the judgment of a State court" must follow to obtain federal *habeas* review.  28 U.S.C. § 2254(a).  AEDPA amended federal *habeas corpus* law to provide, in pertinent part, that "[a]  1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1) .  AEDPA further provides that "[t]he limitation period shall run from ... the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review...." 28 U.S.C. § 2244(d)(1)(A).  In support of this argument, the State suggests that petitioner's conviction became final prior to the imposition of petitioner's sentence.  In light of the United States Supreme Court's recent decision in *Burton v. Stewart*, 127 S.Ct. 793 (2007), the State's argument must be rejected and this petition construed as timely.

In *Burton*, the Court interpreted the term "judgment", which appears in both section 2254 and section 2244(d)(1)(A) and which triggers AEDPA's statute of limitations, as follows:

> "Final judgment in a criminal case means sentence. The sentence is the judgment." Accordingly, Burton's limitations period did not begin until both

21

his conviction *and* sentence "became final by the conclusion of direct review
or the expiration of the time for seeking such review"- which occurred well
after Burton filed his 1998 petition.

*Burton*, 127 S.Ct. at 798-99 (internal citations omitted).

Thus, *Burton* holds that the one-year statute of limitations under the AEDPA does

not begin to run until both the conviction *and* sentence become final, as the "judgment"

under challenge consists of both the sentence the petitioner is serving and the underlying

conviction, pursuant to which the petitioner is being detained.[5]

The Eleventh Circuit recently applied *Burton* in *Ferreira v. Sec'y, Dep't of

Corrections*, 494 F.3d 1286 (11th Cir. 2007). In *Ferreira*, the petitioner was convicted in

state court of first-degree murder and armed robbery. This conviction became final on

December 10, 1997, ninety days after the Florida Supreme Court denied his appeal since

petitioner did not file a *certiorari* petition in the United States Supreme Court.  *Id*. 494 F.3d

at 1288.  The petitioner subsequently filed a motion for post-conviction relief, requesting a

re-sentence, which the trial court granted.  The petitioner was re-sentenced on April 14,

2003. The petitioner filed his *habeas* petition on June 10, 2003 solely challenging his

---

[5]The issue in *Burton* was whether the petitioner's *habeas* petition should be dismissed as an unauthorized
successive petition pursuant to 28 U.S.C. § 2244(b). *Burton v. Stewart*, 127 S.Ct. 793, 794 (2007). The *Burton*
Court found that the petition was a successive petition because the petitioner was contesting the same custody
imposed by the same state court judgment as he previously contested in a petition filed several years before. *See Id.* at
798. The *Burton* Court addressed the AEDPA limitations period in response to the petitioner's argument that if he
had waited to file his first *habeas* petition until state court review of his sentencing claims was complete, he risked
losing the opportunity to challenge his conviction in federal court pursuant to the one-year statute of limitations. *See
Id.* at 798-99. The Court rejected the petitioner's argument on the grounds that the one-year statute of limitations did
not begin to run until both petitioner's conviction and sentence became final. *Id.*

underlying conviction, not the subsequent re-sentence.  The court held that, pursuant to

*Burton*, the statute of limitations under section 2244(d)(1) began to run on April 14, 2003,

the date that the trial court re-sentenced the petitioner during post-conviction proceedings,

not on December 10, 1997, even though the petitioner was only challenging the underlying

conviction. *Id.* at 1292-1293.  In so holding, the court relied on the *Burton* Court's language

quoted above, indicating that both the judgment of conviction and sentencing judgment,

together, form the judgment that imprisons the petitioner.  Thus, the petition was timely

because it was filed within one-year of the judgment which imprisoned the petitioner,

namely, the April 14, 2003 judgment. *Id.*

Here, direct review of petitioner's sentence did not conclude until after petitioner's

original sentence had been vacated and he was properly re-sentenced as a multiple offender

to an enhanced sentence on June 17, 2004.  Specifically, direct review of petitioner's

sentence was available until the thirty day appeal delay expired on July 17, 2004.[6] *See*

La.C.Cr.P. art. 914.  Thus, for AEDPA purposes, petitioner's judgment became final on

that date.[7] *See Parker v. Cain,* 2007 WL 3171833, *2 and fn. 26 (E.D. La. 2007) (finding

---

[6]It is not disputed that a right of direct appeal lies from re-sentencing as an habitual offender. Indeed, the jurisprudence confirms that such direct appeals are provided for under law, and further, that in such appeals the merits of claims directed at the underlying conviction are entertained. *See State v. Redditt*, 868 So.2d 704 (La. App. 5th Cir. 2003); *State v. Harris*, 868 So.2d 886 (La. App. 5th Cir. 2004); *State v. Noil*, 807 So.2d 295 (La. App. 5th Cir. 2001); *State v. Washington*, 866 So.2d 973 (La. App. 5th Cir. 2004).

[7]If this court were to find that petitioner's conviction became final prior to completion of state court review of his enhanced sentencing as an habitual offender, petitioner, and similarly situated Louisiana federal *habeas* petitioners, would find themselves in the anomalous situation discussed in *Burton*. They could be forced to file what may likely be their first and only federal *habeas* petition asserting claims directed at the validity of the conviction, while awaiting the completion of state court review of their sentencing claims, risking the loss of the opportunity to

23

a multiple offender's judgement of conviction was final when further review of petitioner's enhanced sentencing was no longer available under the *Burton* rationale ); *see also Pierre v. Cain*, 2006 WL 2623337 (E.D. La. 2006) (finding the petitioner's conviction became final and the AEDPA limitation period commenced when, after re-sentencing as multiple offender, the petitioner failed to file a motion for appeal within the time allotted by La.C.Cr.P. art. 914); *Newson v. Michael*, 2007 WL 1296872 (W.D. La. 2007) (same); *Jackson v. Jones*, 2006 WL 3589545 (E.D.La. 2006).

This is the case, notwithstanding petitioner's January 28, 2003 oral request for appeal, and his April 2003 motions for an appeal and alleged out-of-time appeal filed prior to the rendition of petitioner's enhanced sentence.  Under Louisiana law, only a final judgment is appealable.  La.C.Cr.P. art 912.  "A final judgment ... is one which puts an end to the proceedings." *State v. Quinones*, 646 So.2d 1216, 1217 (La. App. 5th Cir. 1994).  Therefore, if the "defendant has not been sentenced ... the proceedings are not at an end and the judgment of conviction is not yet final." *Id*.  Indeed, petitioner's motions for appeal filed after conviction and sentencing on the offense, but before his initial re-sentencing as a multiple offender were premature; that "procedural defect" was cured by petitioner's subsequent re-sentencing.  *State v. Page*, 680 So.2d 104, 106 fn. 2 (La.App. 5th Cir. 1996).  Upon re-sentencing as an habitual offender, "the case became ripe for appellate review." *Id*.

---

challenge their sentence in a second or successive subsequently filed federal petition.  This result is clearly not intended by either the letter or spirit of AEDPA which seeks to streamline review of state court convictions by requiring the filing of a comprehensive single federal *habeas* petition, thus avoiding piecemeal review through the filing of multiple federal *habeas* petitions.

Accordingly, considering the foregoing, the undersigned concludes that the instant petition is timely because the judgment for those who have been re-sentenced under Louisiana's habitual offender is final is when review of both the conviction and enhanced sentence is concluded, not at two separate times as suggested by the State.[8] Thus, due to petitioner's re-sentencing as a multiple offender, for purposes of the AEDPA one year time limitation, the judgment which petitioner challenges and under which he is detained (petitioner's underlying judgment of conviction and sentence therefore) did not become final until July 17, 2004, thirty days after petitioner's June 17, 2004 re-sentencing, when the thirty day time limitation for further direct review of petitioner's sentence expired. Therefore, the limitations period started to run on July 17, 2004.

On January 28, 2005, one hundred and ninety-four days later, petitioner filed an application for post-conviction relief in the state trial court. That application and the appeals from it, remained pending before the state courts until August 18, 2006.[9] The instant petition was filed twenty-seven days later on September 14, 2006. Thus, the instant petition is clearly timely.

---

[8] Judge Engelhardt of the Eastern District recently rejected a similar argument under the *Burton* rationale. *Kendall v. Travis*, 2007 WL 2893866, *4-5 (E.D. La. 2007).

[9] To the extent that the State suggests that petitioner's writ application was untimely because the Louisiana Supreme Court did not file the pleading until February 1, 2006, that argument is without merit. The pleading was given to prison authorities for mailing on September 21, 2005. The "mailbox rule" has been approved by the Louisiana Supreme Court. *See* Causey v. Cain, 450 F.3d 601, 604 (5th Cir. 2006) citing *State ex rel. Hensley v. State*, 876 So.2d 78 (La.2004); *State ex rel. Egana v. State*, 771 So.2d 638 (La.2000); *State ex rel. Ward v. State*, 741 So.2d 658 (La.1999); *State ex rel. Gray v. State*, 657 So.2d 1005 (La.1995); *State ex rel. Johnson v. Whitley*, 648 So.2d 909 (La.1995).

This result remains unchanged even if this court excludes the one hundred twenty-four day period between the trial court's February 3, 2005 denial of petitioner's application for post-conviction relief until petitioner timely and properly filed his request for review in the Louisiana First Circuit Court of Appeal on June 8, 2005 as the State suggests.  In all, three hundred and forty-five days of the one year period would have expired if the State's argument is accepted.  The undersigned therefore finds that the instant petition was filed well within the one-year statute of limitations period; the State's limitation defense is without merit.

### Procedural Default

The State also asserts that petitioner's claims, which are directed at his underlying conviction, are procedurally barred.[10]  This contention is based on the State's argument that petitioner's conviction and sentence became final on differing dates, each triggering a different deadline for the filing of post-conviction proceedings.  More specifically, the State claims that petitioner's conviction became final on January 17, 2003, thirty days after the jury returned its verdict (before petitioner was originally sentenced for the offense of conviction).  Hence, pursuant to La.C.Cr.P. article 930.8, petitioner had two years from

---

[10]The scope of federal *habeas* review is limited by the intertwined doctrines of procedural default and exhaustion. Procedural default exists where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, ("traditional" procedural default), or (2) the petitioner fails to properly exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred, ("technical" procedural default). In either instance, the petitioner is deemed to have forfeited his federal *habeas* claim. *Bledsue v. Johnson*, 188 F.3d 250, 254-55 (5th Cir.1999) citing *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1986) and *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

that date, or until January 17, 2005, to file for state post-conviction relief with respect to his underlying conviction.  The State further asserts that the state trial court's one word denial of these claims in post-conviction proceedings indicates that it relied on this article (article 930.8) to reject petitioner's claims on procedural grounds without considering their merits. Thus, the State argues that there exists an adequate and independent state procedural ground supporting application of the traditional procedural default doctrine.  Moreover, because of the alleged untimely assertion of these claims, the State contends that these claims are likewise technically defaulted because they were never properly presented to the state courts.

The State's reliance on the procedural default doctrine is without merit for numerous reasons.  As previously discussed, petitioner's conviction did not become final on January 17, 2003, thirty days after the jury rendered petitioner's guilty verdict, because at that time petitioner had not yet been sentenced.  *See* La.C.Cr.P. art 912 and 914;  *State v. Quinones*, *supra*.  Thus, the two year limitation period did not expire two years later on January 17, 2005 as the State suggests.  To the contrary, and for the reasons set forth more fully above, the claims contained in petitioner's post-conviction application filed exactly two years after petitioner's original January 28, 2003 original sentencing were clearly timely.  Hence, there is no basis for this court to find these claims technically defaulted.

Furthermore, there is no basis for this court to deem petitioner's claims traditionally defaulted. None of the state courts rendering a judgment on petitioner's post-conviction

claims "clearly and expressly" indicated that its judgment rested on any state procedural rule as is required for application of the doctrine, and contrary to the State's suggestion, this court cannot assume reliance on any such rule.  *Coleman v. Thompson*, 501 U.S. 722, *734-735* (1991) ("federal courts on *habeas corpus* review of state prisoner claims ... will presume that there is no independent and adequate state ground for a state court decision ... when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.");  *Amos v. Scott,* 61 F .3d 333, 338 (5th Cir. 1995) ("Procedural default does not bar federal court review of a federal claim raised in a *habeas* petition unless the last state court rendering a judgment in the case has "clearly and expressly" indicated that its judgment is independent of federal law, e.g., rests on a state procedural bar.").  The State's argument on this point is without merit.  Accordingly, a review on the merits of petitioner's claims is required here.

## Merits Review

### *Standard of Review*

This *habeas* petition was filed on September 14, 2006, therefore the standard of review is set forth in 28 U.S.C. § 2254(d), as amended in 1996 by the Antiterrorism and Effective Death Penalty Act (AEDPA).[11]  *Knox v. Johnson,* 224 F.3d 470, 476 (5th Cir.

---

[11]The parties do not argue, nor does the state court record suggest, that the state courts' one word rejection of petitioner's claims during post-conviction proceedings does not constitute an adjudication "on the merits" which is a prerequisite for application of the AEDPA standard of review set forth in § 2254(d).  Moreover, the undersigned is convinced that the Louisiana state courts did adjudicate petitioner's claims on the merits, as opposed to procedurally.

An adjudication on the merits is a term of art that refers to whether a court's disposition of the case was

2000);  *Orman v. Cain,* 228 F.3d 616, 619 (5th Cir. 2000).[12]   AEDPA substantially

restricts the scope of federal review of state criminal court proceedings in the interests of

federalism, comity, and finality of judgments.  *Montoya v. Johnson*, 226 F.3d 399, 403-04

(5th Cir. 2000) *citing Teague v. Lane,* 489 U.S. 288, 306, 109 S.Ct. 1060, 103 L.Ed.2d

334 (1989) and  *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389

---

substantive, as opposed to procedural. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000) *citing Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir.1997).  Whether there was an adjudication on the merits is determined by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinion suggests reliance upon procedural grounds rather than a determination on the merits.  *Id.*

   Weighing these three factors leads to the conclusion that the Louisiana state courts did adjudicate petitioner's post-conviction claims on the merits, as opposed to procedurally. A review of previous Louisiana cases does not reveal any case where claims such as petitioner's were dismissed based on procedural grounds. By itself, this proves nothing, except that this factor does not favor either alternative. However, both the second and third factors weigh in favor of a finding that petitioner's claims were adjudicated on the merits.  With respect to the second factor, there is no suggestion that the Louisiana courts were made aware of any procedural reason for dismissing petitioner's claims; the record is devoid of any answer or response by the State to petitioner's application raising any procedural grounds.  *See Smith v. Warden*, 211 F.3d 125, *1 (5th Cir. 2000) (unpublished) *citing Singleton v. Johnson*, 178 F.3d 381, 384 (1999) (Where the state did not raise procedural grounds for denying relief, it suggested that the state court was not aware of any procedural grounds for dismissal.). Third, the state court opinions, while ambiguous, do suggest that the state courts adjudicated the claims on the merits. The courts would probably have cited the procedural rule relied on in rejecting petitioner's claims or used language other than the word  "denied" had the claims been dismissed procedurally, as Louisiana courts consistently cite procedural rules when rejecting claims on procedural grounds.  The absence of such language is an indication that the courts actually looked at the claims for error.  *See Smith,* 211 F.3d at *1; *Miller,* 200 F.3d at 281 (finding an adjudication on the merits noting that the State did not raise a procedural bar and the denial of relief does not expressly mention the imposition of a procedural bar).

[12]Before enactment of AEDPA, "a federal court entertaining a state prisoner's application for *habeas* relief ...exercise[d] its independent judgment when deciding both questions of constitutional law and mixed constitutional questions (i.e., application of constitutional law to fact).  In other words, a federal *habeas* court owed no deference to a state court's resolution of such questions of law or mixed questions." *Montoya ,* 226 F.3d at 403-04  *citing Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1516, 146 L.Ed.2d 389 (2000) and 28 U.S.C. S 2254(d) (West 1994).

(2000)[13] (noting that AEDPA "placed a new restriction on the power of federal courts to grant writs of *habeas corpus* to state prisoners").

Title 28 U.S.C. § 2254(d) as amended, states as follows:

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

**(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the deferential scheme of § 2254(d), as amended, this court must give deference to a state court decision for "any claim that was adjudicated on the merits in State court proceedings" unless the decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"  28 U.S.C. § 2254(d)(1), or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

---

[13]Justice O'Connor delivered the opinion of the Court with respect to the standard of review, while Justice Stevens delivered the opinion of the court with respect to other aspects of the opinion which have no bearing on the issues herein.  Accordingly, the undersigned will refer to Justice Steven's opinion as a concurring opinion.

A *habeas* petitioner has the burden under AEDPA to prove that he is entitled to relief.  *Ormon*, 228 F.3d at 619 *citing Williams,* 120 S.Ct. at 1518, and *Engle v. Isaac*, 456 U.S. 107, 134-35, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).  Under § 2254(d), as amended, "[t]he federal courts no longer have a roving commission to discern and "correct" error in state court proceedings, but must exercise a more limited review . . ."  *Grandison v. Corcoran*, 78 F.Supp.2d 499, 502 (D. Md. 2000).  Federal courts may not grant the writ merely on a finding of error by a state court or on merely disagreeing with the state court. *Montoya,* 226 F.3d at 404; *Orman,* 228 F.3d at 619.

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a  set of materially indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) *citing Williams,* 120 S.Ct. at 1523;  *Montoya,* 226 F.3d at 403-04 *citing  Williams*, 120 S.Ct. at 1523.  "The 'contrary to' requirement 'refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision.'"  *Dowthitt ,*  230 F.3d at 740 *citing Williams*, 120 S.Ct. at 1523.

Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dowthitt,* 230 F.3d at 741 *citing Williams,* 120 S.Ct. at 1523.  The

standard is one of objective reasonableness. *Montoya,* 226 F.3d at 404 *citing Williams,* 120 S.Ct. at 1521-22.  A federal *habeas* court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . [r]ather, that application must also be unreasonable." *Williams,* 120 S.Ct. at 1522.

Section 2254(d)(2) speaks to factual determinations made by the state courts. *Dowthitt,* 230 F.3d at 741.  Federal *habeas* courts  presume such determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing evidence.  *Id*.  Thus, this court must defer to the state court's decision unless it was based on an unreasonable determination of the facts in light of the record of  the State court proceeding.  *Id. citing* 28 U.S.C. §2254(d)(2); *Knox,* 224 F.3d at 476 *citing Chambers v. Johnson,* 218 F.3d 360, 363 (5th Cir.2000).

## I.  Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed. 2d 674 (1984).  The burden is on the petitioner to show that counsel's representation fell below an objective standard of reasonableness. *Id*. at 688.  The court's scrutiny is "highly deferential" and the court must apply a "strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689-90. "It is not enough to show that some, or even most, defense lawyers would have handled the case differently." *Nichols v. Scott,* 69 F.3d 1255, 1284 (5th Cir. 1995) *quoting Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989).  As the Supreme Court has observed, "[i]t is all too tempting for a defendant to secondguess counsel's assistance after conviction." *Green,* 868 F.2d at 178 *quoting Strickland*, at 689.

To establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," *Strickland,* 466 U.S. at 693.  Rather, *Strickland'*s prejudice element requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[14]  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) *citing*

---

[14]The *Strickland* court outlined the extent of prejudice that must be established by the defendant: An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of the criminal proceeding if the error had no effect on the judgment. *Cf. United States .v Morrison,* 449 U.S. 361, 364-65 (1981).

Defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability exists if the probability is sufficient to undermine confidence in the outcome.

When a defendant challenges a conviction , the question is whether there is reasonable probability that absent the errors the fact-finder would have a reasonable doubt respecting guilt.

*Strickland, supra*, at pages 691-692.

*Strickland,* 104 S.Ct. at 2068.  However, self serving conclusory statements that the outcome would have been different "fall far short of satisfying *Strickland'*s prejudice element."  *Id.*

Because both *Strickland* factors, that of deficient performance and prejudice, must be satisfied, "an ineffective assistance contention may be rejected on an insufficient showing of prejudice, without inquiry into the adequacy of counsel's performance."  *Strickland,* 466 U.S. at 689-94.  Petitioner must satisfy both prongs of *Strickland,* demonstrating both that counsel's  performance was deficient and that the deficiency prejudiced the defense.  *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999); *Green v. Johnson,* 160 F.3d 1029, 1035-36 (5th Cir. 1998). However, "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.*" Green,* 160 F.3d at 1043.

_____Petitioner contends that he received ineffective assistance of counsel during pre-trial preparation when counsel allegedly failed to investigate petitioner's case and perform the "basic duties of representation." Petitioner cites fourteen instances, without explanatory factual or legal citation, in support of his claim.  These allegations are addressed below.

## A.  Misidentification

_____Petitioner alleges that his counsel failed to challenge his "misidentification though an in-court/out-of-court confirmation or line-up."  He complains that "no one on one confrontation between petitioner and victims were ever performed for identification

confirmation."  However, the record reveals that none of the armed robbery victims were able to identify petitioner as the robber because the perpetrator wore a mask, and that this was the reason that no line-up was done.[15]   Indeed, with respect to the first and second robberies, this fact was confirmed by defense counsel during the November 22, 2002 preliminary examination.[16]  Thus, a defense request for a line-up or some type of in-court identification by the victims would have been foolish. Failure to make a futile motion or objection does not cause counsel's performance to fall below an objective level of reasonableness. *See United States v. Preston*, 209 F.3d 783, 785 (5th Cir. 2000) *citing Green*, 160 F.3d at 1037; *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) *citing Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").

To the extent that petitioner suggests that his counsel was deficient for failing to challenge the victims' description of the clothing worn by the perpetrator and those worn by petitioner at the time of his arrest prior to trial, that claim is likewise without merit. Such challenges are routinely reserved for trial on the merits, when defense counsel may take the witness by surprise, without having given the witness pre-trial notice of the issue or an opportunity prior to trial to formulate a reasoned response.  Although other defense counsel may have chosen to challenge the witnesses' description of the clothing prior to trial, "[i]t is

---

[15]*See* Patterson, tr. pg. 456; Hatch, tr. pg. 462; Brown, tr. pg. 466, 469; Aucoin, tr. pg. 471; Crochet, tr. pg. 511.

[16]tr. pg. 739-740.

not enough to show that some, or even most, defense lawyers would have handled the case differently." *Nichols,* 69 F.3d at 1284 *quoting Green*, 868 F.2d at 178. Thus, the undersigned cannot find that counsel's performance was objectively unreasonable. Moreover, given this court's "highly deferential" scrutiny and "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance", this court will not secondguess counsel's assistance after conviction. *Green,* 868 F.2d at 178; *Strickland*, at 689-90.

Furthermore, in his cross-examination of the victims and law enforcement witnesses at trial, petitioner brought out the differences between the clothing worn by petitioner at the time of his arrest, green shorts and shirt, and that described by the witnesses, highlighting those differences during his closing argument.[17]  However, given the testimony of police officers who saw petitioner exit Lakeside Supermarket wearing a grey covering on his face, pursued petitioner without losing sight of him, saw him drop a grey article of clothing which matched material found around petitioner's neck, heard petitioner state that he dropped the knife while running, and found the stolen money, checks and red money bag

---

[17]*See* Patterson, tr. pg. 455-457 (dark shorts, light colored shirt and light colored wrapping around head), statement, 120 (white shirt, navy shorts, light covered wrapping around his head); Hatch, tr. pg. 462, 464 (darkish blue or black shorts, gray-grayish blue jersey thing over his face, shirt not the same color as the shorts), statement, 121 (gray mask); Brown, tr. pg. 466 (grayish blue mask, shorts), statement, 122 (gray mask); Aucoin, tr. pg. 471, 473 (dark blue or black shorts, shirt matching the shorts with some white on it, mask), statement, 123 (gray cover over his face); Crochet, tr. pg. 508-509, 519 (green shirt and green shorts at booking, one witness (Patterson) said white shirt, dark shorts in police report of robbery call in); closing, tr. pg. 540. Contrary to petitioner's allegations, the record reveals that the statement of only one witness, Ms. Patterson, indicates that petitioner was wearing a white shirt. That witness merely saw the perpetrator as she was driving outside the store.  The remainder of the witnesses who were robbed by the perpetrator did not comment on the shirt in their statements and at trial gave differing descriptions of the shirt color worn by the perpetrator with dark colored shorts.

under petitioner, those discrepancies were apparently insufficient for the jurors to acquit petitioner of the Lakeside Supermarket armed robbery.[18]  Thus, the undersigned cannot find that petitioner has established the requisite prejudice under *Strickland*; there has been no showing "that there is a reasonable probability that, but for counsel's [alleged] unprofessional error [failing to challenge the victims' description of the clothing worn by the perpetrator and those worn by petitioner at the time of his arrest prior to trial], the result of the proceeding would have been different."

**B.  Motion to Suppress/Quash**

Petitioner also alleges that his counsel was deficient for failing to file a pre-trial motion to suppress or quash his identification.   As noted above, the State did not rely on any identification of petitioner by the victims either prior to, or during, trial.  Thus, there was no "identification" by the victims to challenge by Motion to Suppress or Motion to Quash.  Failure to make a futile motion or objection does not cause counsel's performance to fall below an objective level of reasonableness. *See Preston*, 209 F.3d at 785 *citing Green*, 160 F.3d at 1037; *Johnson*, 306 F.3d at 255 *citing Koch*, 907 F.2d at 527, *supra*.

Likewise, to the extent that petitioner claims that his counsel was ineffective for failing to file petitioner's *pro se* Motion to Suppress, instead keeping the motion in his file, for this same reason, that claim is without merit. [see tr. pg. 434].  Prior to trial, the court

---

[18]Maze, tr. pg. 481-487; Vidos, tr. pg. 489-493; LaRocca, tr. pg. 498-499; Crochet, tr. pg. 500-503, 506-507, 511-512, 517-519.

denied petitioner's *pro se* Motion to Suppress finding it "not well founded" because  the

issues raised in the Motion did not go to the admissibility, but rather were matters for

argument to the jury. [tr. pg. 437]. Counsel's alleged failure to file petitioner's unfounded

Motion did not constitute deficient  performance. *Preston*, 209 F.3d at 785 *citing Green*,

160 F.3d at 1037; *Johnson*, 306 F.3d at 255 *citing Koch,* 907 F.2d at 527, *supra*.

Furthermore, contrary to petitioner's allegations, the Motion to Suppress was not merely

placed in defense counsel's file, but rather had been filed with the court prior to petitioner's

trial on December 6, 2002. [tr. pg. 100-104].

## C.  Store Surveillance Video

Petitioner alleges that his counsel was ineffective for failing to obtain and view the

Lakeside Supermarket store surveillance video, which would have allegedly proved that

petitioner was not the individual seen coming out of the store as the witnesses stated.  This

claim is without merit.  It is undisputed that the Lakeside Supermarket had no video

surveillance cameras and hence, there was no video for counsel to obtain or view.[19]

Therefore, counsel cannot be faulted for failing to obtain or view this non-existent

recording. It is equally undisputed that counsel did obtain videos from the other two armed

robberies in response to his Motion for Discovery.[20]  Considering that petitioner was

acquitted of these charges, petitioner cannot demonstrate any prejudice, whether counsel

---

[19]Crochet, tr. pg. 511, 512.

[20]tr. pg. 50-51, 733-734.

viewed these videos or not.

**D.  Failure to Question Officers/View Crime Scene**

Petitioner claims that his counsel was ineffective for failing to question the arresting officers prior to trial and failing to view the crime scene.   Petitioner fails to disclose what this questioning or viewing would have revealed, or how this would have affected his case. It is clear, however, that counsel did obtain a copy of the entirety of the State's file. [tr. pg. 733].  Moreover, the transcript reveals that petitioner used a diagram of the Lakeside Supermarket crime scene during the trial. [tr. pg. 539-540].  Furthermore, during trial, petitioner consulted with his counsel after which he asked additional questions of the witness about the location of the knife relative to where petitioner had been arrested, indicating that counsel, in fact, knew details about the crime scene. [tr. pg. 478-479].

A defendant who alleges a failure to investigate on the part of his counsel must do more than merely allege a failure to investigate; he must state with specificity what the investigation would have revealed, what evidence would have resulted from that investigation, and how such evidence would have altered the outcome of the trial. *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) *citing Gray v. Lucas*, 677 F.2d 1086 (5th Cir.1982), *United States v. Lewis*, 786 F.2d 1278 (5th Cir.1986), and *Alexander v. McCotter*, 775 F.2d 595 (5th Cir.1985).  Petitioner has not shown what this further investigation, questioning or viewing would have revealed and how it would have helped him.  In light of the above references to the State court record, petitioner fails to

39

demonstrate that a different outcome would have resulted if counsel had investigated his case further.  Thus, petitioner is entitled to no relief with respect to this claim.

## E.  Failure to Question Evidence Location

Petitioner alleges that his counsel was ineffective when he failed to question the investigating detective (Crochet) during the pretrial hearing on petitioner's request for preliminary examination about the "whereabouts" of evidence, namely, petitioner's clothes, the stolen money and red money bag.  Had he done this, petitioner suggests, counsel would have become aware that "no red money bag was ever in evidence."  He additionally faults counsel for not arguing "against the whereabouts" of  statements and victims during pretrial discovery.

The record reveals that petitioner's counsel extensively questioned Crochet at the preliminary examination regarding the evidence which would be presented against petitioner. [tr. pg. 739-742].  Moreover, the record reveals that defense counsel did inquire about, as well as obtain, the witnesses' statements through his Motion for Discovery; the defense was provided with the entirety of the State's file, including statements of the witnesses/victims and reports generated by law enforcement personnel. [tr. pg. 50-51, 733-734, 467].

While counsel did not specifically ask for the location of various items recovered at the scene, or in whose possession they had been placed, petitioner fails to demonstrate how the failure to discover the location or possessor of those items prejudiced his defense.  At

trial, the clothes worn by petitioner at the time of his arrest were produced pursuant to a subpoena issued by defense counsel and entered by the defense into evidence. [tr. pg. 105, 433-435, 139, 508].  Further, the State did not have to enter the money or money bag into evidence to convict petitioner as petitioner suggests. Numerous witnesses testified regarding the stolen money and red money bag which were found under petitioner at the time of his arrest.[21]   The fact that these items were released to their owner prior to trial neither provides a basis for disallowing that testimony, nor casts doubt upon the veracity of that testimony.   Accordingly, there is no reasonable probability that, but for counsel's alleged failure, the result of the proceeding would have been different. *Sayre, supra*. Petitioner's claim is therefore meritless.

## F.  Failure to Interview Store Patrons

Petitioner alleges that counsel was ineffective because he failed to interview "witnesses (patrons in store) who would have testified petitioner was not [the] individual coming out or near [the] store." Petitioner does not provide this court with the names of these alleged favorable witnesses, nor any competent evidence of the substance of their alleged favorable testimony.

Complaints of uncalled witnesses are not favored in federal *habeas corpus* review because allegations of what the witness would have testified are largely speculative.  *Sayre*

---

[21]Hatch, tr. pg. 462-463;  Brown, tr. pg. 466; Aucoin, tr. pg. 470-471; Knope, tr. pg. 475-477; Maze, tr. pg. 483, 487; Vidos, tr. pg. 491; Larocca, tr. pg. 498-499; Crochet, tr. pg. 501; property release, State ex. 7, tr. pg. 124.

*v. Anderson*, 238 F.3d 631, 635-36 (5th Cir.2001) *citing Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986), *Marler v. Blackburn,* 777 F.2d 1007, 1010 (5th Cir. 1985), *Murray v. Maggio,* 736 F.2d 279, 282 (5th Cir.1984), *United States v. Cockrell,* 720 F.2d 1423, 1427 (5th Cir. 1983), and *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978); *Evans*, 285 F.3d at 377.  "[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, a habeas court cannot even begin to apply *Strickland* 's standards because it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance." *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

Moreover, where the only evidence of a missing witness's testimony is from the defendant, courts view such claims with great caution.  *Sayre,* 238 F.3d at 636 *citing Lockhart,* 782 F.2d at 1282, *Marler,* 777 F.2d at 1010,  *Murray,* 736 F.2d at 282, *Cockrell,* 720 F.2d at 1427, and *Buckelew* , 575 F.2d at 521.  Thus, "[a] prisoner's bald conclusory assertion that [favorable] witnesses were not called does not serve to 'overcome the strong presumption that his counsel's actions were reasonable.'" *Sayre,* 238 F.3d at 636 *citing Marler,* 777 F.2d at 1010.

Finally, conclusory speculation about the effect of the unidentified favorable witness' testimony falls far short of the *prima facie* showing of prejudice necessary for federal *habeas corpus* relief. *Id. citing Cockrell*, 720 F.2d at 1427.  To demonstrate the requisite

*Strickland* prejudice, the petitioner must show not only that the witness' testimony would have been favorable, but also that the witness was available and willing to testify at trial. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985); *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981).

Although petitioner speculates as to the content of the unknown and un-interviewed store patrons' testimony, he fails to affirmatively demonstrate that such testimony would not only have been available, but also would have been favorable and sufficiently exculpatory to undermine confidence in the resulting verdict.  Petitioner has neither identified the patrons, nor provided this court with affidavits or similar matter from any of the unidentified favorable witnesses suggesting what they would have testified to had counsel interviewed them prior to trial.  Petitioner's bald and conclusory speculation about the effect of the unidentified and un-interviewed favorable witness' testimony falls far short of the *prima facie* showing of prejudice necessary to warrant *habeas* relief.  *Sayre,* 238 F.3d at 636; *Alexander*, 775 F.2d at 602; *Boyd v. Estelle*, 661 F.2d at 390; *Lockhart*, 782 F.2d at 1282; *Marler*, 777 F.2d at 1010; *Cockrell*, 720 F.2d at 1427.

## G.  Motion for Release

_____Petitioner complains that defense counsel "failed to argue petitioner's release after [the] trial court granted his Motion" for release under La.C.Cr.P. article 701.   Contrary to petitioner's allegations, the record provides no basis for petitioner's claim. The record reveals that petitioner's Motion for Release without bail was not granted as petitioner

alleges.  Rather, the State was ordered to show cause why the Motion should not be granted at a hearing which was conducted on June 17, 2002. [tr. pg. 43].  The minutes of the hearing reveal that at the hearing petitioner was represented by Gregory P. Aucoin of the Indigent Defender Board, the Motion was taken up and after a bench conference and, for the oral reasons assigned by the court, the Motion was denied. [tr. pg. 12].  The record further reveals that there was no basis for petitioner's release under article 701.  Petitioner was arrested on March 19, 2002, the date of the third robbery, and the State filed a Bill of Information charging petitioner with three counts of armed robbery on April 29, 2002.[22] [tr. pg. 39].  Under these circumstances, counsel was neither deficient, nor did any alleged deficiency cause petitioner any prejudice.

## H.  Motion for Speedy Trial

Petitioner argues that counsel was deficient for failing to argue for his release on grounds that his statutory right to a speedy trial within 120 days of his arrest had elapsed. The record reveals that petitioner's Motion for Speedy Trial was granted on April 19, 2002 and accordingly, the State was ordered to follow the dictates of La.C.Cr.P. art. 701. [tr. pg. 29].  However, even if petitioner's statutory 120 day period for commencement of trial had expired as petitioner contends, he fails to explain how his attorney's failure to assert the alleged statutory lapse caused him any prejudice.

---

[22]La.C.Cr.P. art. 701(B)(1)(a) and (2) requires the State to file a Bill of Information or an Indictment within sixty days of arrest when the defendant is being held in custody for a felony, and one hundred fifty days of arrest when the defendant is not being held in custody for a felony.

Article 701 provides for pre-trial release without bail pending commencement of the prosecution; it does not provide for dismissal of charges, nor does it provide an affirmative defense to a state criminal prosecution based upon alleged violations of the defendant's right to speedy trial.  That remedy is obtained by the filing of a Motion to Quash after the expiration of the time for commencement of trial following institution of the prosecution, which, in non-capitol felony cases, is two years.  *See* La.C.Cr.P. arts. 578(2); 532(7); 581; *State v. Rome*, 630 So.2d 1284, 1286 (La. 1994).  Petitioner's trial, which commenced approximately nine months after petitioner's arrest, was well within this period.  Under these circumstances, petitioner has not shown a reasonable probability that, but for counsel's alleged unprofessional error, the result of the proceeding would have been different.  His allegations fall far short of satisfying *Strickland'*s prejudice element. *Sayre* and *Strickland, supra.*

## I.  Oral Motion to Dismiss

Petitioner asserts that his counsel was ineffective for failing to orally move to dismiss the March 12, 2002 and March 17, 2002 armed robbery counts at the November 22, 2002 hearing on the defense Motion for Preliminary Examination as petitioner allegedly requested he do.  Petitioner has not shown that this alleged failure fell below the standard of objective reasonableness.  At the conclusion of the preliminary examination there was no basis for dismissal of either of these counts.  The State had presented sufficient evidence of the similarity of all three crimes, that is, a black male suspect wearing a mask or covering

over his face, clear plastic gloves, carrying a large knife, to permit the State to try petitioner

on all three crimes together, circumstantially tying the two prior armed robberies to the

third.  [tr. pg. 734-735; La.C.Cr.P. art. 493].  Hence, counsel was not deficient for failing to

make a futile motion. *Preston*, 209 F.3d at 785 *citing Green*, 160 F.3d at 1037; *Johnson*,

306 F.3d at 255 *citing Koch,* 907 F.2d at 527, *supra*.

Petitioner also fails to demonstrate how this alleged deficiency caused him

prejudice.  Petitioner was ultimately acquitted of both counts, and petitioner has not shown

that the result of his trial would have been any different had counsel urged his unfounded

Motion to Dismiss at an earlier stage of the proceeding. To the extent that petitioner could

argue that trial on three as opposed to two counts of armed robbery in some way tainted the

jurors' verdict with respect the March 19, 2002 armed robbery, the record belies any such

claim.  The jurors were expressly instructed by the court that petitioner had been charged

with three separate counts of armed robbery and that "[e]ach count shall be separate from

the others. And a separate verdict rendered with respect to each count charged.  The

verdicts need not be consistent, but shall be based solely on the evidence adduced with

regard to each individual charge." [tr. pg. 552, 559].[23]  Indeed, that is exactly what the

jurors did, rendered a verdict on each charge, acquitting petitioner of two, while convicting

petitioner of the third armed robbery.

_____

[23]The prosecutor mirrored those remarks in rebuttal closing in response to petitioner's argument that he be
convicted of all or none of the charges, repeatedly telling the jurors that "you're supposed to reach an individual
verdict on each one of these cases." [tr. pg. 543-544].

## J.  Copies of Police Reports and Statements

Petitioner next faults counsel for failing to give him copies of the police reports and written statements he received in discovery, complaining that he read Iva Brown's statement for the first time during trial.  Initially, the undersigned notes that petitioner did not decide to represent himself until after the trial had begun.  Thus, the undersigned cannot find that counsel's alleged failure to provide petitioner with his own copies of  discovery received from the State was objectively unreasonable.  Clairvoyance is not a required attribute of effective representation.  *See Sharp v. Johnson*, 107 F.3d 282, 290 at fn. 28 (5th Cir. 1997).  Furthermore, in the passage cited by the defendant, it is clear that petitioner was given a copy of the witness' statement prior to his cross-examination of the witness.  Finally, given that defense counsel, who had prior access to this information, was present during the entirety of petitioner's trial as standby counsel, and that petitioner was expressly cautioned that he would not be given additional time to prepare or investigate his case and that he would not be able to later claim counsel's ineffectiveness prior to undertaking his own defense, the undersigned cannot find that counsel's alleged error caused petitioner any prejudice.  This claim therefore does not warrant federal *habeas corpus* relief.

## K.  Trial Strategy/Preparation of Defense

Petitioner contends that he received ineffective assistance of counsel because counsel failed to interview petitioner and investigate petitioner's case to formulate a trial strategy or defense.  Petitioner contends this was not done because counsel felt that

petitioner was guilty and that he should therefore accept the State's plea offer.  This claim is refuted by the record before this court.

The record reveals that, prior to trial, the defense filed several motions, including a Motion for Speedy Trial, a Motion for Release, a Motion for Discovery and a Motion for Preliminary Hearing. [tr. pg. 29, 43, 50-52].  The latter Motions were heard on November 22, 2002.  As a result of the Discovery Motion, defense counsel was provided all documents contained in the State's file, as well as access to videos, still photographs and audio from the officer's patrol unit at the time of petitioner's arrest.  [tr. pg. 733-734].  Furthermore, as a result of the preliminary examination, defense counsel was able to obtain the facts upon which the State would rely. [tr. pg. 734-744].

Moreover, contrary to petitioner's allegations, at the November 22, 2002 hearing defense counsel was adamant that he had listened to Mr. Barbee's whole story on two occasions. [tr. pg. 838-839].  The Judge assured petitioner that prior to petitioner's trial date Mr. LeGros would meet with him again. [tr. pg. 840].  The record reflects that this meeting did in fact occur; petitioner admitted in open court that he had met with Mr. LeGros on December 13, 2002.  At that meeting, petitioner requested that LeGros issue subpoenas for the clothes petitioner was wearing when he was booked on March 19, 2002, as well as his mug shot that date.  That was in fact done by LeGros that same date, and the presence of those items at trial verified by him through communication with a police officer. [tr. pg. 105, 433-435].

48

In light of these actions, this court cannot find that defense counsel and petitioner did not discuss trial strategy or petitioner's defense during their meeting as petitioner suggests, because these items were necessary for presentation of petitioner's misidentification defense. Indeed, in the absence of some discussion on strategy and defense of the charges, there would have been no reason for the issuance of the subpoena in the first instance. Finally, the record reveals that during trial, in his capacity as standby counsel, Mr. LeGros continued to assist petitioner with his defense, consulting with petitioner, assisting in presentation of objections and with the formulation of jury charges, and even testifying on petitioner's behalf. [tr. pg. 478, 487, 522-527, 528].

For these reasons, petitioner has not satisfied his burden to show that his counsel's representation in this regard fell below an objective standard of reasonableness. *Strickland*, at 688. This court will not secondguess counsel's assistance after conviction. *Green,* 868 F.2d at 178 *quoting Strickland*, at 689.

Petitioner's complaint that his counsel felt that petitioner was guilty and that he should therefore accept the State's plea offer constitutes ineffective assistance fares no better. Counsel stated on the record that he had listened to petitioner's story on two occasions and that in light of that story he had advised petitioner that in his professional opinion, the case was going to be difficult if not impossible to win. In light of the above discussion, counsel's assessment of petitioner's case did not stop counsel from taking the steps necessary to present a defense to the charges against petitioner. Moreover, in light of

the evidence presented against petitioner at trial, this court cannot find counsel's assessment of petitioner's case and recommendation that petitioner accept the State's plea offer was objectively unreasonable.  *Strickland*, at 688.

## II.  Waiver of Counsel

Petitioner claims that his right to counsel, a fair trial and due process were violated when the trial court permitted him to represent himself without inquiring into petitioner's dissatisfaction with defense counsel or his concerns about counsel's preparedness for trial. Petitioner contends that his defense counsel was not prepared for trial and that he was therefore faced with a "Hobson's choice", choosing between unprepared counsel or proceeding *pro se* with no counsel.  Thus, petitioner asserts that he was involuntarily forced to waive his right to counsel.

Clearly established federal law requires that a defendant's waiver of the right to counsel be knowing, voluntary and intelligent. *See Johnson v. Zerbst,* 304 U.S. 458, 464-465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).  The crux of petitioner's claim is that his waiver of counsel was not voluntary because his court appointed counsel was unprepared to represent petitioner at trial, forcing petitioner to make the "constitutionally repugnant choice" between representation by unprepared appointed counsel and self-representation. *See Dunn v. Johnson*, 162 F.3d 302, 307 (5th Cir. 1998).  However, for all of the reasons set forth above, the undersigned has determined that counsel's pre-trial performance was not

50

constitutionally deficient, and more specifically, that defense counsel was neither

incompetent nor unprepared.  To the contrary, the record demonstrates the opposite.

Accordingly, petitioner was not placed in the "constitutionally repugnant" position of having

to choose between incompetent and unprepared counsel or having no counsel at all, and he

was not forced to relinquish his right to counsel.  Moreover, "[a] defendant's refusal

without good cause to proceed with able appointed counsel constitutes a voluntary waiver

of that right."  *Dunn*, 162 F.3d at 307.  In sum, petitioner has failed to demonstrate that his

waiver of counsel was involuntary, his claim is therefore without merit. *See Smith v.*

*Dretke*, 2006 WL 1951161, *5 (N.D. Tex. 2006).

Petitioner's claim also fails under the applicable standard of review.  There is no

clearly established federal law, as determined by the United States Supreme Court, which

dictates that, as a minimum constitutional prerequisite to a knowing, voluntary and

intelligent waiver of counsel, a court explicitly inquire into the defendant's dissatisfaction

with, or concerns about, his counsel's preparedness for trial.  The Supreme Court has not

considered this precise issue. The only support for petitioner's position is contained in

circuit court decisions.  However, those decisions cannot be the basis for federal *habeas*

*corpus* relief, nor can this court infer from these decisions that the Supreme Court has

recognized that the inquiry suggested by petitioner is a clearly established constitutional

prerequisite for a valid waiver of counsel. Indeed, contrary to petitioner's suggestion, the

Supreme Court has repeatedly emphasized that a knowing, voluntary and intelligent waiver

51

depends on the totality of "facts and circumstances" in a given case, and it has generally rejected arguments urging adoption of *per se* waiver rules based on any single factor.  *See Edwards,* 451 U.S. at 482 *quoting Johnson,* 304 U.S. at 464 and *North Carolina v. Butler,* 441 U.S. 369, 374-76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (declining to replace totality of circumstances standard for assessing knowing and voluntary waiver of right to counsel with an "inflexible *per se* rule" requiring such waivers always to be explicit).

Because no Supreme Court decision clearly establishes that an inquiry into a defendant's dissatisfaction with, or concerns about, his counsel are constitutionally required for a valid waiver of the right to counsel, and because there is no other challenge raised to petitioner's waiver of this right, the undersigned concludes that the state court's rejection of petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, and therefore he is not entitled to *habeas* relief.

Finally, contrary to petitioner's contention, the record reveals that the trial court did, in fact, inquire into petitioner's dissatisfaction with his counsel at the November 22, 2002 hearing. After petitioner was advised of his right to counsel, petitioner was granted ample opportunity to voice his dissatisfaction with, and concerns about, his court appointed counsel.  However, those concerns were directly refuted by Mr. LeGros who stated on the

record that he had listened to petitioner's side of the story on two occasions.[24] After

considering Mr. Barbee's allegations and Mr. LeGros' response thereto the court decided

to maintain Mr. LeGros as petitioner's attorney.  [tr. pg. 837-840].  The court's inquiry was

more than adequate; the court listened to petitioner's concerns and correctly found those

concerns insufficient to threaten LeGros' ability to provide petitioner with effective

representation or to provide good cause to entitle petitioner to new counsel.[25]  *See United*

*States v. Fields*, 483 F.3d 313, 352 (5th Cir. 2007); *United States v. Creel*,  158 Fed. Appx.

627, 628 (5th Cir. 2004) (unpublished) (defendant's "disagreements with counsel" did not

constitute "good cause" for him to receive a new attorney); *See also Morris v. Slappy*, 461

U.S. 1, 14, 103 S.Ct. 1610, 1617 (1983) (the Sixth Amendment does not guarantee an

accused a "meaningful attorney-client relationship").

The record further demonstrates that LeGros again met with petitioner to discuss his

defense prior to trial, as the court had assured him LeGros would do. [tr. pg. 105, 433-

435].  Moreover, the record is replete with instances where petitioner and LeGros

conferred during trial after LeGros had been appointed as standby counsel.  [tr. pg. 478,

487, 522-527, 528].  Indeed, petitioner acknowledged LeGros' assistance during his closing

argument stating that he would not want "anybody else, but him, sitting next to me." [tr. pg.

---

[24]Courts presume that attorneys make truthful representations to the court and may give substantial weight to those representations.  *United States v. Fields*, 483 F.3d 313, 352 (5th Cir. 2007).

[25]Indigent defendants have no right to appointed counsel of their choice.  *Fields,* 483 F.3d at 350. This "rule would be rendered a nullity if insubstantial complaints entitled defendants to substitute counsel."  *Id.*

543].  Under the circumstances presented herein, and given that this court has found that Mr. LeGros was not constitutionally inadequate, the undersigned cannot find that the state trial court had a duty to investigate any further into petitioner's objections. *Dunn*, 162 F.3d at 307; *Fields*, 483 F.3d at 350-352.

For the reasons set forth above, petitioner's waiver of counsel was voluntary.  His claim therefore does not warrant federal *habeas corpus* relief.

## III.  Self-Representation

Petitioner complains that the trial court abused its discretion when it permitted petitioner to represent himself after the trial had commenced without showing that the prejudice to petitioner (in not being permitted to represent himself) overbalanced the potential disruption of the proceedings already in progress.

Petitioner relies on case law discussing situations where a defendant was *not* permitted to proceed *pro se* because of the alleged untimeliness of the request.  *See e.g. Chapman v. United States*, 553 F.2d 886 (5th Cir. 1977); *Fulford v. Maggio*, 692 F.2d 354, 362 (5th Cir. 1982), *rvs'd on other grounds*, 462 U.S. 111, 103 S.Ct. 2261 (1983). However, that is not the case here.  In those cases relied on by petitioner, the courts note that the right to self-representation is not absolute, but rather, that the right may be limited based on untimeliness of the request.  *Chapman*, 553 F.2d at 893; *Fulford*, 692 F.2d at 362. In such cases, courts balance the prejudice to the defendant in not being permitted to represent himself against factors such as disruption of the proceedings, inconvenience and

delay, and possible confusion of the jury to determine whether the trial court abused its discretion in denying the accused's request.  *See Johnson v. Collins*, 20 F.3d 465 (5th Cir. 1994) *citing Fulford*, 692 F.2d at 362.

Here, petitioner's request to represent himself was granted.  Therefore, petitioner's right to self-representation was not prejudiced, and there is nothing for this court to balance. Furthermore, an express statement of the court's reasons for allowing, or disallowing, an untimely request for self-representation is not required as petitioner suggests.  *Fulford*, 692 F.2d at 362.  Finally, on the record before this court, it is clear that there was no disruption of the proceedings, inconvenience, delay, or jury confusion outweighing petitioner's right to present his own defense.  Thus, there was no abuse of the trial court's discretion. Petitioner's claim is clearly without merit.

Moreover, the record reveals that after petitioner invoked his Sixth Amendment right to self-representation, the trial court properly granted petitioner's request to proceed *pro se.*  An "accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *see also Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with his eyes open.'" *Faretta,* 422 U.S.

at 835, 95 S.Ct. 2525 *quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).  While courts are required to provide *Faretta* warnings, there is no "sacrosanct litany" of inquiries which are mandated; instead, courts must use their discretion in determining the precise nature of the warning depending on the circumstances of the individual case. *Davis*, 269 F.3d at 518-519.

The record establishes that before his trial Barbee was informed of his right to counsel and that after invocation of his right to proceed *pro se* he was warned of the dangers and disadvantages of self-representation. [tr. pgs. 837-838; 427-433].  The trial court advised petitioner that it was not in his best interest to represent himself and that such a decision is almost always unwise, that litigation of defenses and trial issues required a degree of skill and training not ordinarily possessed by lay persons, and that for this reason self-representation might be detrimental to him. In addition, petitioner was specifically admonished that he would be expected to follow technical rules of procedure and evidence and that he would receive no special considerations because of his lack of legal ability and legal training. Moreover, the court confirmed that petitioner had not made a "snap" decision to represent himself, but that he had considered self-representation "all along."

The court also advised petitioner that he would have no extra time to prepare his case or to investigate, and that he would receive no special library privileges.  The court also questioned petitioner about the impending litigation, verifying petitioner's understanding of both the charges and possible penalty for the charges.  Petitioner's

responses reflect that he had a general knowledge of the order of the proceedings and how to present his case to the jury, including his right to present an opening statement and to make objections. Further, petitioner had the added experience of having completed three years of college, including pre-law classes, and having observed legal proceedings in the past.  Petitioner was expressly cautioned that Mr. LeGros would have no responsibility for trying the case and that petitioner would not be able to later claim either a lack of or inadequate representation.

Given the court's extensive questioning and petitioner's responses thereto, it is beyond question that petitioner's waiver of assistance of counsel was knowing, intelligent, and voluntary; petitioner was made aware of the dangers and disadvantages of self-representation, his responses indicate that he knew and understood what he was doing and that his choice was made with his "eyes open."  Therefore, petitioner's self-representation did not violate the Constitution, and petitioner is not entitled to federal *habeas corpus* relief.

## IV.  LAW LIBRARY ACCESS

Petitioner contends that the facility in which he was detained prior to trial did not have sufficient law books.  Thus, he claims that he was unable to adequately represent himself at trial and was thereby unconstitutionally denied access to court.  Because petitioner knowingly, voluntarily and intelligently waived appointed representation by counsel and elected to represent himself, he did not have a clearly established right under federal law to access a law library to prepare his *pro se* defense while he was in jail prior

to, and during, his criminal trial.  *Kane v. Garcia Espitia*, 546 U.S. 9, 126 S.Ct. 407 (2005); *See also Degrate v. Godwin*, 84 F.3d 768, 768-769 (5th Cir. 1996) ("having rejected the assistance of court appointed counsel, [petitioner] had no constitutional right to access a law library in preparing the *pro se* defense of his criminal trial"); *United States v. Smith*, 907 F.2d 42, 45 (6th Cir. 1990) ("[B]y knowingly and intelligently waiving his right to counsel, the appellant also relinquished his access to a law library"); *United States v. Chatman,* 584 F.2d 1358, 1361 (4th Cir. 1978); *United States v. Sammons,* 918 F.2d 592, 602 (6th Cir. 1990); *United States ex rel. George v. Lane*, 718 F.2d 226, 231 (7th Cir. 1983); *United States v. Byrd,* 208 F.3d 592, 593 (7th Cir. 2000) *citing United States v. Chapman*, 954 F.2d 1352, 1362 (7th Cir. 1992); *United States v. Cooper*, 375 F.3d 1041, 1051-1052 (10th Cir. 2004); *Jackson v. Caddo Correctional Center*, 67 Fed.Appx. 253 (5th Cir. 2003).  Accordingly, petitioner's allegations do not provide a basis for federal *habeas corpus* relief.  *Kane*, 546 U.S. at 408.

## V. Re-Appointment of LeGros

Petitioner complains that the trial court abused its discretion when it re-appointed Mr. LeGros to represent petitioner in the multiple offender proceeding.  He contends that "[a]t a bare minimum, the court could have assigned any of the other competent indigent defenders in St. Mary Parish."

The record reveals that on April 4, 2003 petitioner requested an attorney from the Indigent Defender's office, other than Mr. LeGros, be appointed to assist him in the

multiple offender proceedings.   The judge advised petitioner that the only thing he could do was to appoint the Indigent Defender Board.  [tr. pg. 598].  Although the judge later stated on May 9, 2003 that he would "request" another indigent defender be appointed, he did not promise petitioner that this would be the case. [tr. pg. 603].  At the July 18, 2003 multiple offender hearing, the court told petitioner that he had appointed the Indigent Defender Board and that Mr. LeGros was going to represent him, to which petitioner replied, "Okay.  That's fine ..." [tr. pg. 609].  After recessing to allow petitioner to consult with Mr. LeGros, petitioner voiced no further objection.  To the contrary, he acknowledged on the record that he had received all the documents upon which the State would rely and that Mr. LeGros had explained those documents to him, as well as the State's burden of proof and petitioner's rights at the hearing. [tr. pg. 609-610]. Mr. LeGros thereafter cross examined the State's witness and argued on petitioner's behalf. [tr. pg. 614-620].

It is well settled that the right to counsel guaranteed by the Sixth Amendment does not include the right to counsel of one's choice; an indigent defendant has no right to appointed counsel of his choice.[26]  *Fields*, 483 F.3d at 350 *citing United States v. Breeland*, 53 F.3d 100, 106 n. 11 (5th Cir.1995); *Yohey v. Collins,* 985 F.2d 222, 228 (5th Cir.1993); *See also  Morris v. Slappy*, 461 U.S. 1, 14, 103 S.Ct. 1610, 1617 (1983).

_____

[26]To the extent that petitioner suggests that he and LeGros had an "irreconcilable conflict", that contention is not well founded. Disagreement between the defendant's view of appropriate trial strategy and that of his counsel does not give rise to a "conflict" necessitating appointment of new counsel. *Fields,* 483 F.3d at 353 citing *United States v. Corona-Garcia*, 210 F.3d 973, 977 fn. 2 (9th Cir. 2000); *See also Creel*, 158 Fed. Appx. at 628( defendant's "disagreements with counsel" did not constitute "good cause" for him to receive a new attorney.); *Morris*, 461 U.S. at 14 (the Sixth Amendment does not guarantee an accused a "meaningful attorney-client relationship").

Moreover, the record is clear that petitioner ultimately accepted the assistance of Mr. LeGros, who effectively cross examined the State's witness and argued zealously on petitioner's behalf, thereby waiving his objection through acquiescence.  *See Faretta*, 465 U.S. at 173-174; *McKaskle*, 465 U.S. at 182 (discussing waiver of the right to self-representation via approval by conduct).  Therefore, petitioner's claim is without merit.

Based on the foregoing reasons, the undersigned recommends that Barbee's §2254 petition be **DENIED AND DISMISSED WITH PREJUDICE**.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  *Douglass v. United Services Automobile Association,* 79 F.3d 1415 (5th Cir. 1996).**

Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

Signed March 17, 2008, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE